**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Civil Action No. 20-cv-00457-CMA-MDB

SASHA CRONICK,

     Plaintiff,

v.

CHRISTOPHER PRYOR,
ROBERT MCCAFFERTY, and
MICHAEL INAZU,

     Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

---

     This matter is before the Court on Defendants Christopher Pryor, Robert McCafferty, and Michael Inazu's Motion for Summary Judgment. (Doc. # 71.) For the following reasons, the Motion is granted in part and denied in part.

**I.     BACKGROUND**

     This is a 42 U.S.C. § 1983 case arising from an encounter between Plaintiff Sasha Cronick and Colorado Springs Police Officers. Unless otherwise indicated, the following material facts are undisputed.

     On the morning of December 12, 2018, Plaintiff and her husband were leaving their home at the Sun Springs Motel in Colorado Springs when a neighbor shouted for help because a man was overdosing and not breathing. (Doc. # 79 at 1.) Plaintiff called

911 to report the overdose and stayed on the phone with dispatch to coach her neighbor through performing CPR on the overdosing man (hereinafter, "patient"), who was laying in the doorway of a motel room. (Doc. # 79-3 at 2; Doc. # 71-7, Cronick Cell Phone Footage at 00:00–04:18.) Plaintiff used her cell phone to record what was happening while she talked her neighbor through giving the patient CPR. (Doc. # 71-7, Cronick Cell Phone Footage at 00:00–04:56.)

At approximately 9:20 a.m., Defendant Officer Robert McCafferty ("McCafferty") was dispatched to the Sun Springs Motel to respond to the reported overdose. (Doc. # 71-5 at 1; Doc. # 71-6, McCafferty BWC at 02:15.) According to Defendants, the Sun Springs Motel is located in an area of Colorado Springs known as the South Nevada Corridor, which is "one of the busiest 911 indicators in the City of Colorado Springs" because of the prevalence of drug use, alcohol use, and violence in the area. (Doc. # 71 at 1.) Defendants state that emergency calls from the South Nevada Area and the Sun Springs Motel in particular are dangerous and unpredictable. (*Id.*)

When McCafferty arrived, Plaintiff was standing within two or three feet of the patient's head, using her cell phone to take a video recording. (Doc. # 71-7, Cronick Cell Phone Footage, at 04:50–04:59.) McCafferty also saw a woman (the neighbor who had performed CPR) in the motel room packing items into bags. (Doc. # 71-5 at 1.) Less than a minute later, the Colorado Springs Fire Department ("CSFD") arrived at the scene and began attending to the patient. (Doc. # 71-6, McCafferty BWC at 02:56–03:15; Doc. # 71-7, Cronick Cell Phone Footage at 05:35–06:10.) Plaintiff explained to

CSFD that she did not know the patient and that she had just called 911. (Doc. # 71-7, Cronick Cell Phone Footage at 05:58–06:09.)

Once CSFD was treating the patient, McCafferty moved to investigate the motel room. (Doc. # 71-6, McCafferty BWC at 04:05–04:16.) Plaintiff told McCafferty that there was another individual in the motel room bathroom, in addition to the neighbor who had performed CPR and was packing up her bags in the room. (*Id.*; Doc. # 71-7, Cronick Cell Phone Footage at 06:46–06:52.) McCafferty stopped the woman from packing and detained her by asking her to stay seated in a chair outside the motel room. (Doc. # 71-5 at 1; Doc. # 71-6, McCafferty BWC at 04:38–05:00; Doc. # 71-7, Cronick Cell Phone Footage at 07:27–07:37.) McCafferty then returned to the motel room where he found an unknown man in the bathroom. (Doc. # 71-5 at 1; Doc. # 71-6, McCafferty BWC at 05:11.) McCafferty patted the man down and detained him by asking him to sit down on the bed. (Doc. # 71-5 at 1; Doc. # 71-6, McCafferty BWC at 05:11–06:10.) While McCafferty was patting the man down, he told Plaintiff, who was still standing outside, that there was no need for her to record because his body worn camera was recording everything. (Doc. # 71-6, McCafferty BWC at 05:53–06:00.) McCafferty also asked Plaintiff if she lived there, and Plaintiff responded that she lived at the motel but not in that room. (*Id.* at 05:58–06:03.)

McCafferty began interviewing the man seated on the bed. (*Id.* at 06:15.) Less than two minutes later, Defendant Officer Christopher Pryor ("Pryor") arrived at the Sun Springs Motel with trainee officer Daniel Lambert ("Lambert"). (*Id.* at 07:42–07:45; Doc. # 71-9 at 2.) McCafferty updated Pryor and Lambert on the situation and asked them to

speak with the woman seated in the chair outside who had been packing up her bags. (Doc. # 71-6, McCafferty BWC at 07:45–08:14.) Lambert then began to interview the woman seated in the chair. (Doc. # 71-11, Lambert BWC at 06:35–07:45.)

Pryor, meanwhile, positioned himself in between the CSFD and Plaintiff, who was still recording, and began speaking with Plaintiff. (Doc. # 71-12, Pryor BWC at 06:45; Doc. # 71-7, Cronick Cell Phone Footage at 11:12–11:16.) Plaintiff told Pryor that she was recording, that she lived at the motel and had called 911 for the patient, and that the woman seated in the chair had performed CPR on the patient. (Doc. # 71-12, Pryor BWC at 06:45–07:45.) Pryor asked Plaintiff what room she lived in, and she said, "I'm not answering questions like that." (*Id.* at 07:45–07:48.) She then referenced "police harassment." (*Id.* at 07:48–07:55.) When Pryor said he was interviewing her because she was a witness and called 911, Plaintiff responded, "I didn't witness anything, I just called." (*Id.* at 07:55–07:58).

The parties dispute several facts relating to the encounter between Plaintiff and Pryor. Significantly, the parties dispute whether Plaintiff was civil and helpful to the officers before speaking with Pryor or whether Plaintiff was obstructing the scene and impeding CSFD's work treating the patient. *Compare* (Doc. # 71 at 2), *with* (Doc. # 79 at 6), *and* (Doc. # 82 at 1). On the officers' body worn camera footage and Plaintiff's cell phone footage, there is no indication that the CSFD employees who were tending to the patient ever requested any help, stated to anyone that Plaintiff was disrupting their work, or appeared uncomfortable or bothered by Plaintiff's presence a few feet away. *See, e.g.*, (Doc. # 71-6, McCafferty BWC at 03:08–09:57; Doc. # 71-7, Cronick Cell

4

Phone Footage at 05:35–11:15.) However, Defendants assert that "[Plaintiff's] proximity to an unrelated patient, presence in the medical treatment scene, and unknown connection to possible criminal activity required the CSFD to divert their attention away from the patient to [Plaintiff] to ensure their own physical [sic] and continuity of care for the patient." (Doc. # 71 at 2.) In support, Defendants point to two affidavits submitted by CSFD firefighters/EMTs who were at the scene at the Sun Springs Motel. (Doc. # 71-1; Doc. # 71-2.) In each affidavit, the firefighters state that they "feared that [Plaintiff] may get violent, have a weapon, or try to attack" the CSFD personnel and that Plaintiff "hindered and obstructed the performance of" their duties. (Doc. # 71-1 at ¶ 23; Doc. # 71-2 at ¶ 23.) Plaintiff contends that the credibility of these affidavits and the weight to be accorded to the statements therein should be questions for the jury, particularly considering that the affidavits were signed on December 15, 2022—four years after the incident—and the affidavits provide the first indication that any CSFD personnel were at all bothered by Plaintiff while they were treating the patient. (Doc. # 79 at 2–3.)

Next, the parties vehemently dispute whether Pryor "ordered" Plaintiff to leave the scene, or whether Pryor failed to order Plaintiff to do anything before the situation escalated. *Compare* (Doc. # 71 at 4), *with* (Doc. # 79 at 4). Immediately after Plaintiff indicated that she did not have any information and that she had just called 911, Pryor said, "Why don't you go over there? Why don't you leave the scene?" (Doc. # 71-12, Pryor BWC at 07:56–08:03.) Plaintiff said, "I don't need to, I live here." (*Id.* at 08:00–08:03.) It is also disputed whether Pryor grabbed Plaintiff's arm after she turned and began to walk away, or whether Pryor "lightly touched [Plaintiff's] left arm" to ensure she

left the scene. *Compare* (Doc. # 79 at 4), *with* (Doc. # 71 at 4.) The body worn camera footage shows Plaintiff step back and then say, "Don't touch me." (Doc. # 71-12, Pryor BWC at 08:02–08:05.) Plaintiff again yelled at Pryor not to touch her as she turned and walked away from him and away from the scene. (*Id.* at 08:03–08:09.) Pryor followed Plaintiff to the middle of the parking lot while she continued to yell at him not to touch her. (*Id.*) Among other things, Plaintiff yelled, "Don't fucking put your hands on me," and "Officer, I need your name." (*Id.* at 08:10–08:26.)

Defendants assert that McCafferty and Lambert were "forced" to abandon their investigations to aid Pryor; however, Plaintiff contends that Pryor never called for help and that McCafferty and Lambert simply heard Plaintiff yelling and walked to where Plaintiff and Pryor were standing in the middle of the parking lot. *Compare* (Doc. # 71-1 at 5), *with* (Doc. # 79 at 5); *see also* (Doc. # 71-6, McCafferty BWC at 09:57–10:20). McCafferty asked Pryor, while they were standing in front of Plaintiff, whether Plaintiff needed to be charged with disorderly conduct. (*Id.*) For approximately 30 seconds, McCafferty and Pryor discussed charging Plaintiff while Plaintiff demanded to talk to their supervisor. (Doc. # 71-12, Pryor BWC at 08:15–08:49.) Then, without warning, McCafferty and Pryor grabbed Plaintiff by her arms, and McCafferty said, "Right now, you're under arrest." (*Id.* at 08:46–09:05.) The parties dispute whether McCafferty and Pryor had control of Plaintiff and took her to the ground, or whether Plaintiff passively resisted, went limp, and collapsed her knees to the ground. *Compare* (Doc. # 71 at 5–6), *with* (Doc. # 79 at 5–6), *and* (Doc. # 82 at 2). McCafferty and Pryor handcuffed Plaintiff while she was face down in the parking lot. (Doc. # 71-12, Pryor BWC at 08:46–

09:05.) Immediately after applying handcuffs, McCafferty conducted a pat-down search of Plaintiff. (Doc. # 71-6, McCafferty BWC at 11:00–11:15.) Pryor eventually placed Plaintiff in the back of a police car while she was handcuffed and closed the door. (*Id.* at 12:37–12:50; Doc. # 71-12, Pryor BWC at 10:45–12:40.)

After Plaintiff was handcuffed and placed in the police car, McCafferty and Pryor's supervisor, Defendant Michael Inazu ("Inazu") arrived at the scene. (Doc. # 71 at 6.) Inazu reviewed the body worn camera footage, interviewed everyone involved, and determined that Plaintiff should be cited and released with a summons and complaint for failure to desist or disperse. (*Id.* at 5–6.) It appears from the body worn camera footage submitted by Defendants that Plaintiff was both handcuffed and in the back of the police car for approximately 38 minutes (Doc. # 71-6, McCafferty BWC at 12:50–50:40), and she was in handcuffs for at least 47 minutes before being released (*id.* at 10:40–57:47).[1]

At the conclusion of a bench trial in municipal court, Plaintiff was found not guilty of failure to desist or disperse under Colorado Springs Code of Ordinances § 9.2.103. (Doc. # 71-16.) Specifically, the municipal court judge found that Pryor had not issued an order to Plaintiff to leave, so that element of the crime of failure to desist or disperse was not met. (*Id.* at 4.) At their depositions, Defendants Pryor, McCafferty, and Inazu each testified that they would behave exactly the same way in the same circumstances if they were to happen tomorrow, and Defendants Inazu and McCafferty testified that

---

[1] It appears that Plaintiff was handcuffed for more than 47 minutes, but it is unclear from the different body worn camera recordings exactly how much time she spent in handcuffs.

they disagreed with the municipal judge's decision. (Doc. # 79-1 at 12; Doc. # 79-2 at 9; Doc. # 79-4 at 14.)

Plaintiff initiated this lawsuit on February 20, 2020. (Doc. # 1.) In her Amended Complaint (Doc. # 47), she asserts (1) a Fourth Amendment excessive force claim against Defendants Pryor and McCafferty; (2) a Fourth Amendment Unlawful Seizure/Unlawful Search/False Arrest claim against all Defendants; and (3) a Fourth Amendment malicious prosecution claim against all Defendants.[2] Defendants filed the instant Motion for Summary Judgment on all of Plaintiff's claims on December 16, 2022. (Doc. # 71.) Plaintiff subsequently submitted her Response (Doc. # 79), and Defendants followed with their Reply (Doc. # 82). The matter is now ripe for review.

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *See id.* However, conclusory statements based merely on conjecture,

---

[2] In an Order dated January 13, 2022 (Doc. # 54), this Court granted in part Defendants' Motion to Dismiss (Doc. # 48) and dismissed Plaintiff's municipal liability claims against the City of Colorado Springs.

speculation, or subjective belief do not constitute summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in his favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671.

### III.   **DISCUSSION**

Defendants argue that they are entitled to qualified immunity on each of Plaintiff's claims. "Qualified immunity balances two important interests – the need to hold public

officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). When a § 1983 defendant raises a qualified immunity defense, the plaintiff bears the burden of overcoming it. *Simpson v. Little*, 16 F.4th 1353, 1359 (10th Cir. 2021). "At summary judgment, the plaintiff must (1) raise a genuine issue of material fact that the defendant violated a federal constitutional or statutory right, and (2) show the right was clearly established at the time of the defendant's violative conduct." *Id.*

## A.     FOURTH AMENDMENT UNLAWFUL SEIZURE/FALSE ARREST

Defendants first assert that they are entitled to qualified immunity on Plaintiff's Fourth Amendment unlawful seizure/false arrest claim because (1) the seizure was a valid investigative detention supported by reasonable suspicion; and (2) even if the seizure constituted an arrest, the arrest was supported by probable cause. (Doc. # 71 at 8–12.) In response, Plaintiff argues that there are genuine disputes of material fact precluding summary judgment and that a reasonable jury could determine that the seizure was an unlawful arrest lacking probable cause. (Doc. # 79 at 15–17.)

1.     Applicable Law

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. In considering what constitutes a "seizure," the Supreme Court "has identified three types of police/citizen encounters: consensual encounters, investigative stops, and arrests." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc) (quoting *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir.

2000)). Consensual encounters are not seizures under the Fourth Amendment and need not be supported by any suspicion of criminal wrongdoing. *Id.*

An investigative detention, also called a *Terry* stop, "is an encounter in which police may stop and briefly detain a person for investigative purposes." *Plascencia v. Taylor*, 514 F. App'x 711, 714 (10th Cir. 2013) (unpublished) (quoting *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012)); *see Terry v. Ohio*, 392 U.S. 1 (1968). During a *Terry* stop, an officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *Cortez*, 478 F.3d at 1115 (quoting *Oliver*, 209 F.3d at 1186). "For an officer to have reasonable suspicion to seize an individual, the officer 'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* (quoting *Oliver*, 209 F.3d at 1186).

A warrantless arrest, by contrast, is permissible "when an officer 'has probable cause to believe that a person committed a crime.'" *Id.* (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)). An arrest is distinguished from an investigative detention by the involuntary, "highly intrusive" nature of the encounter. *Oliver*, 209 F.3d at 1186. If a police encounter exceeds the limits of a *Terry* stop, the detention becomes an arrest that must be supported by probable cause. *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002). While the use of forceful measures does not automatically convert an investigative detention into an arrest, the "use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest." *Plascencia*, 514 F. App'x at 715 (quoting *Cortez*, 478 F.3d at 1116).

11

"Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004) (quotation omitted). The probable cause analysis is an objective one, and the officer's subjective reason for the arrest is irrelevant. *Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008).

2.   Constitutional Violation

The parties' briefing raises two issues relating to whether Plaintiff can establish that Defendants violated her Fourth Amendment right to be free from unreasonable seizure: (1) whether the seizure was an investigative detention or an arrest; and (2) depending on the level of seizure, whether the officers had the requisite reasonable suspicion or probable cause to believe that Plaintiff was engaged in criminal activity. The Court will address each in turn.

a.   *Investigative Detention or Arrest*

First, with respect to the level of police/citizen encounter that took place between the officers and Plaintiff on the morning of December 12, 2018, the Court agrees with Plaintiff that the seizure exceeded the bounds of an investigative detention and constituted a warrantless arrest. The relevant facts include, but are not limited to:

- Defendants knew that Plaintiff had called 911 to report the overdose, that she lived at the Sun Springs Motel, and that she had been present assisting while the neighbor performed CPR on the patient;

- Plaintiff never threatened any officer or anyone else;

- before Officers McCafferty and Pryor seized Plaintiff, she had turned and walked several steps away from where CSFD was treating the patient;

- Officers McCafferty and Pryor openly discussed arresting and criminally charging Plaintiff with disorderly conduct immediately before grabbing her;

- Officer McCafferty told Plaintiff she was under arrest when he grabbed her;

- Officers McCafferty and Pryor grabbed Plaintiff and each had control of one of her arms;

- Officers McCafferty and Pryor handcuffed Plaintiff while she was facedown in the parking lot; and

- Plaintiff was handcuffed for at least 47 minutes and handcuffed in the back of a police car for approximately 38 minutes.

Based on these undisputed facts, the Court finds that Defendants did not seize Plaintiff for any investigative or safety purpose, but rather arrested her for purported disorderly conduct.

Critically, Defendants grabbed Plaintiff and handcuffed her while she was face down in the parking lot, which is a "highly intrusive" form of detention characteristic of an arrest. *Oliver*, 209 F.3d at 1186; *see also Cortez*, 478 F.3d at 1115–16 (stating that the use of handcuffs and other forceful techniques "generally exceed the scope of an investigative detention and enter the realm of arrest"). Defendants concede that they handcuffed Plaintiff, but they argue that the use of handcuffs does not necessarily transform an investigative detention into a full custodial arrest. (Doc. # 71 at 10.)

Defendants are correct that "a *Terry* stop does not become unreasonable just because police officers use handcuffs on a subject or place [her] on the ground." *Neff*, 300 F.3d at 1220; *see also Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007) ("Under certain circumstances, the steps officers may permissibly take to protect their safety include drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground."). However, the Tenth Circuit has made clear that there must be "a reasonable, articulable ground for fearing danger from the suspect" to justify using more forceful measures during a *Terry* stop. *Neff*, 300 F.3d at 1221. In *Neff*, for example, the court concluded that the use of handcuffs was appropriate during an investigate detention because the officers had received a reliable report that the defendant was armed with a particularly dangerous weapon. *Id.* In this case, by contrast, there is no indication that Plaintiff was armed or dangerous in any way so as to raise an objective concern of officer safety. *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1052–53 (10th Cir. 1994) (concluding that the use of handcuffs during a *Terry* stop was unjustified where the officers "had no tips or observations that the suspects were armed or violent").

Although the parties do not address the length of detention, the Court also finds it significant that Plaintiff was handcuffed for at least 47 minutes and placed in the back of a police car for approximately 38 minutes. *See United States v. Place*, 462 U.S. 696, 709 (1983) ("[T]he brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion."). In *Neff*, the Tenth Circuit found that the seizure

did not exceed the limits of a *Terry* stop in part because the defendant "was handcuffed for only a few minutes" before the missing gun was located and the officers were assured of their safety. *Neff*, 300 F.3d at 1221. Considering that no facts in this case indicate that the officers had an objective reason to fear for their safety from Plaintiff, particularly after she was handcuffed and subject to a pat down search, the Court finds that the length of detention and use of handcuffs was unreasonable and that the seizure was an arrest that must be supported by probable cause.

### b.   Probable Cause

Having determined that the seizure was an arrest, the Court must now consider whether Defendants had probable cause to effectuate the arrest based on the totality of the circumstances. Defendants contend that the undisputed material facts demonstrate that there was probable cause to charge Plaintiff with (1) disorderly conduct in violation of Colo. Rev. Stat. § 18-9-106(1)(a) & (c); (2) obstruction in violation of Colo. Rev. Stat. § 18-8-104(1)(a); and (3) failure to desist and disperse in violation of the Colorado Springs Code of Ordinances § 9.2.103. (Doc. # 71 at 11.) Although Defendants assert broadly that probable cause existed for "every element" of each of these offenses, Defendants do not address any element or discuss any offense in detail. (*Id.* at 12.) The Court will begin with disorderly conduct.

### i.   <u>Disorderly Conduct</u>

Colo. Rev. Stat. § 18-9-106 provides, in relevant part:

(1) A person commits disorderly conduct if he or she intentionally, knowingly, or recklessly:

    (a) Makes a coarse and obviously offensive utterance, gesture, or display in a public place **and the utterance, gesture, or display tends to incite an immediate breach of the peace**; or

  . . .

    (c) Makes unreasonable noise in a public place or near a private residence that he has no right to occupy.

Colo. Rev. Stat. § 18-9-106(1) (emphasis added). Beginning with subsection (1)(a), the Court finds that the evidence does not show that Plaintiff made an utterance that "tends to incite an immediate breach of the peace" when she repeatedly yelled at Pryor not to touch her. Although Plaintiff used profanity when she yelled things like "keep your fucking hands off of me," such speech does not constitute inciting speech or "fighting words" unprotected by the First Amendment within the meaning of the disorderly conduct statute. *See City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (stating that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers" unless the speech constitutes "fighting words"); *Brandt v. City of Westminster*, 300 F. Supp. 3d 1259, 1268–69 (D. Colo. 2018) (summarizing cases and explaining that the Colorado legislature expressly limited the disorderly conduct statute to apply only to "fighting words" by including the "immediate breach of the peace" limitation); *see also United States v. McKinney*, 9 F. App'x 887, 888–89 (10th Cir. 2001) (unpublished) (holding that a statement telling a police officer to "go fuck himself" was protected speech). Absent any evidence that Plaintiff made statements that could constitute "fighting words," the Court concludes that Defendants did not have probable cause to arrest Plaintiff for violating § 18-9-106(1)(a).

Defendants' argument that they had probable cause to suspect Plaintiff of disorderly conduct under subsection (1)(c) (prohibiting "unreasonable noise in a public place or near a private residence that [s]he has no right to occupy") likewise fails for First Amendment reasons. In *People v. Fitzgerald*, 573 P.2d 100, 104 (Colo. 1978), the Colorado Supreme Court made clear that § 18-9-106(1)(c) "cannot, consistent with First Amendment rights, be construed to prohibit automatically all speech which might disturb people even when the speaker had that intent." Instead, the statute may constitutionally prohibit only "the use of the human voice to disturb others when there is no substantial effort to communicate or when the seeming communication is used as a guise to accomplish disruption." *Id.* The Colorado Supreme Court adopted the following rule for interpreting the word "noise" as used in § 18-9-106(1)(c) "insofar as it relates to communication":

> When the word "noise" in the statute is properly construed consistent with the First Amendment and traditional views, it encompasses communication made in a loud manner only when there is a clear and present danger of violence or where the communication is not intended as such but is merely a guise to disturb persons.

*Fitzgerald*, 573 P.2d at 104 (quoting *In re Brown*, 510 P.2d 1017, 1021 (Cal. 1973)).

Applying this rule, the Court finds that the undisputed facts in this case demonstrate that the officers did not have probable cause to suspect Plaintiff of engaging in disorderly conduct pursuant to subsection (1)(c). The "noise" at issue in this case is Plaintiff's repeated yelling, sometimes with profane language, at Pryor to not touch her and her loud demands to speak with a supervisor. It is axiomatic that such speech is protected under the First Amendment and does not fall within the definition of

"noise" as used by the disorderly conduct statute. *See Hill*, 482 U.S. at 462 ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."); *Fitzgerald*, 573 P.2d at 104. Because Plaintiff's shouting did not incite a "clear and present danger of violence," and because Plaintiff was clearly communicating rather than making noise only as a guise to disturb others, there was no probable cause to suspect Plaintiff of violating subsection (1)(c) of the disorderly conduct statute.

ii.   <u>Obstruction</u>

Next, Defendants assert that the undisputed material facts demonstrate that there was probable cause to charge Plaintiff with obstruction.

> A person commits obstructing a peace officer, firefighter, emergency medical service provider, rescue specialist, or volunteer when, **by using or threatening to use violence, force, physical interference, or an obstacle**, such person knowingly obstructs, impairs, or hinders the enforcement of the penal law or the preservation of the peace by a peace officer, acting under color of his or her official authority; . . . [or] knowingly obstructs, impairs or hinders the administration of medical treatment or emergency assistance by an emergency medical service provider or rescue specialist, acting under color of his or her official authority.

Colo. Rev. Stat. § 18-8-104(1)(a) (emphasis added). "The threat or use of an obstacle or interference 'requires conduct of sufficient magnitude to obstruct, impair, or hinder' a police officer." *People in Interest of K.D.W.*, 471 P.3d 1276, 1284 (Colo. App. 2020) (quoting *Dempsey v. People*, 117 P.3d 800, 810 (Colo. 2005)). However, the obstacle or physical interference may not be merely verbal opposition. *See* Colo. Rev. Stat. § 18-8-104(1.5) ("A person shall not be charged with [obstruction] because the person

remained silent or because the person stated a verbal opposition to an order by a government official."); *Norwell v. City of Cincinnati*, 414 U.S. 14, 16 (1973) (holding that "one is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer"). "[A]lthough mere verbal opposition alone may not suffice, a combination of statements and acts by the defendant, including threats of physical interference or interposition of an obstacle can form the crime of obstruction." *Dempsey*, 117 P.3d at 811.

The Court finds that several genuine disputes of material fact preclude summary judgment on the issue of whether Defendants had probable cause to arrest Plaintiff for obstructing a peace officer or obstructing an emergency medical service provider. These genuine disputes of material fact include, but are not limited to:

- whether Plaintiff was civil and helpful to the officers and CSFD personnel before the situation with Pryor escalated;
- whether Plaintiff's conduct in filming the scene a few feet away from the patient was obstructive or distracting to CSFD personnel treating the patient; and
- whether Pryor issued any order to Plaintiff prior to grabbing her.

A reasonable jury, viewing the evidence in the light most favorable to Plaintiff, could determine that Plaintiff did not use or threaten to use physical interference or an obstacle when she called 911, recorded the scene while coaching her neighbor through CPR, and continued to record after CSFD personnel and Defendants arrived. Likewise, a reasonable jury could find that Pryor did not give any order to Plaintiff or, if he did, that

Plaintiff was complying when she turned and walked several feet away from the patient towards the middle of the parking lot. The Court also notes that Plaintiff's refusal to answer Pryor's question about which motel room she was staying in while Plaintiff and Pryor were engaged in a consensual encounter cannot amount to a violation of the obstruction statute. Colo. Rev. Stat. § 18-8-104(1.5); *see Kaufman v. Higgs*, 697 F.3d 1297, 1301 (10th Cir. 2012) ("Refusal to answer questions during a consensual encounter . . . is not an 'obstacle' as the term is used in [§ 18-8-104(1)(a)]."). Pursuant to Colorado law and the First Amendment, Plaintiff could not have been lawfully arrested for obstruction for her silence or for merely verbally protesting the actions of Officer Pryor. The Court therefore finds that a reasonable jury could conclude that Defendants lacked probable cause to arrest Plaintiff for obstruction.

### iii.   *Failure to Desist or Disperse*

Lastly, Defendants maintain that they had probable cause to arrest Plaintiff for failure to desist or disperse in violation of the Colorado Springs Code of Ordinances § 9.2.103. The Code provides:

It is unlawful for any person to intentionally, knowingly or recklessly fail or refuse to obey an order which:

A. Is made by a peace officer while in the discharge or apparent discharge of the officer's duties; and

B. Directs that person, or a group of which that person is a member, to desist from conduct or disperse from an area; and

C. Is given at a time when that person individually or with others is participating in a course of conduct or is present in an area where the conduct or presence creates, maintains, or aggravates an immediate substantial danger of damage or injury to persons or property or substantially obstructs the performance of any government function.

Colorado Springs Code of Ordinances § 9.2.103.

The parties vigorously dispute whether Pryor issued an "order" to Plaintiff that she refused to obey. After viewing the body worn camera, the Court finds that it is a question for the jury whether Pryor ever "ordered" Plaintiff to leave the scene. If the jury finds that Pryor did order Plaintiff to leave, the jury must then determine *when* he issued the order and, significantly, if Plaintiff complied by turning and walking away from the patient. The Court notes that a municipal judge, after viewing the body worn camera and hearing testimony, concluded that Pryor never issued an order to Plaintiff and therefore found Plaintiff not guilty of failre to desist or disperse. (Doc. # 71-16 at 4.)

For the foregoing reasons, the Court finds that Plaintiff has met her burden of raising a genuine issue of material fact that Defendants violated her constitutional right to be free from unreasonable seizure/false arrest under the Fourth Amendment by arresting her without probable cause. *Simpson*, 16 F.4th at 1359.

3.      Clearly Established

The Court must next address whether it was clearly established that Defendants' actions violated Plaintiff's Fourth Amendment rights. "A clearly established right is one that is sufficiently clear that every reasonable officer would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotations omitted). "A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right," *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018), but a case directly on point is not required so long as "existing precedent [has] placed the statutory or constitutional question beyond debate," *White v.*

*Pauly*, 580 U.S. 73, 79 (2017); *see York v. City of Las Cruces*, 523 F.3d 1205, 1212 (10th Cir. 2008).

It is clearly established that police officers cannot arrest an individual for refusing to answer questions or for verbally opposing an officer's questions or conduct. As the Tenth Circuit stated in *Kaufman*, it is "well established that a citizen has no obligation to answer an officer's question during a consensual encounter; and the Colorado Supreme Court has made it clear that the Colorado obstruction statute is not violated by mere verbal opposition to an officer's questioning." 697 F.3d at 1304. While Plaintiff's use of profanity may have angered or aggravated Pryor, the Tenth Circuit has stated that profane words are not "of such a character that their very utterance caused injury or that they tended to incite the listener to an immediate breach of the peace." *McKinney*, 9 F. App'x at 889 (quotation omitted) (considering an incident where an individual told an officer to "go fuck himself"). Stated differently, "[t]hough her lack of civility may be disheartening, [Plaintiff] has a constitutional right to voice her objections to the officer's inquiries." *Id.* The Court therefore finds that, viewing the evidence in the light most favorable to Plaintiff, no reasonable officer would have believed that they were justified in arresting Plaintiff merely because she yelled at Pryor. *See Kaufman*, 697 F.3d at 1304; *see also Shroff v. Spellman*, 604 F.3d 1179, 1188 (10th Cir. 2010) ("It has long been established that an arrest and search without probable cause that a crime has been committed violates the Fourth Amendment."); *Manzanares v. Higdon*, 575 F.3d 1135, 1150 (10th Cir. 2009) ("[A]ny reasonable officer would understand that it is unconstitutional to handcuff someone absent probable cause or an articulable basis to

suspect a threat to officer safety combined with reasonable suspicion."). As such, Defendants are not entitled to qualified immunity and their Motion for Summary Judgment must be denied with respect to Plaintiff's Fourth Amendment unreasonable seizure/false arrest claim.

**B.    FOURTH AMENDMENT UNLAWFUL SEARCH**

Defendants' arguments that they are entitled to summary judgment on Plaintiff's Fourth Amendment unlawful search claim are derivative of their arguments that they are entitled to summary judgment on her Fourth Amendment unlawful seizure claim. Essentially, Defendants assert that a *Terry* stop permits a reasonable search for weapons, or, alternatively, Defendants had probable cause to arrest Plaintiff and the search was a valid search incident to arrest. (Doc. # 71 at 12–13.)

It is a "basic constitutional rule . . . that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well defined exceptions.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). Where probable cause to arrest exists and where certain exigent circumstances are present, a "very limited" warrantless search may pass constitutional muster. *Brown v. Dietz*, 12 F. App'x 848, 851 (10th Cir. 2001) (unpublished). Exigent circumstances exist when "(1) the law enforcement officers have objectively reasonable grounds to believe that there is an immediate need to protect their lives or others, and (2) 'the manner and scope of the search is reasonable.'"

*Cortez*, 478 F.3d at 1123–24 (quoting *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006)).

As recited above, the Court finds that Plaintiff has met her burden of demonstrating a genuine dispute of material fact that Defendants violated her Fourth Amendment right to be free of unlawful seizure by arresting her without probable cause. As such, Plaintiff has also presented a triable issue as to whether Defendants' search of Plaintiff after the arrest violated her Fourth Amendment right to be free from unreasonable searches. *See, e.g.*, *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1256 n.7 (10th Cir. 1998) (concluding that because "there was not probable cause to support the warrantless arrest, the pat-down search incident to arrest was also improper"). The Court also finds that the evidence presented in this case does not establish objectively reasonable grounds of an emergency or exigent circumstances justifying Defendants' search of Plaintiff, such as "an immediate need to protect their lives or others from serious or threatened injury." *Cortez*, 478 F.3d at 1124. Significantly, there is no evidence showing that the officers had an "articulable and reasonable suspicion" that Plaintiff was armed and dangerous so as to justify a pat-down search. *See United States v. Garcia*, 459 F.3d 1059, 1064 (10th Cir. 2006). Defendants are therefore not entitled to qualified immunity, and Plaintiff's Fourth Amendment unreasonable search claim may proceed to trial.

## C.     FOURTH AMENDMENT EXCESSIVE FORCE

Plaintiff's unlawful arrest and excessive force claims are treated as separate causes of action. *See Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1313 (10th Cir. 2015).

In considering Plaintiff's excessive force claim, the Court must determine whether the force used to arrest Plaintiff exceeded "the force reasonably necessary to effect a *lawful* arrest or detention under the circumstances of the case." *Id.* (quoting *Cortez*, 478 F.3d at 1126.) Thus, the Court must "assume, for sake of argument" in this section that Defendants had probable cause to arrest Plaintiff.[3] *Id.*

Claims that police used excessive force during a seizure are analyzed under the Fourth Amendment's objective reasonableness standard. *See Huff v. Reeves*, 996 F.3d 1082, 1089 (10th Cir. 2021). To determine the objective reasonableness of the use of force, the Court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *McCowan v. Morales*, 945 F.3d 1276, 1283 (10th Cir. 2019) (quoting *McCoy v. Meyers*, 887 F.3d 1034, 1045 (10th Cir. 2018)). In conducting this balancing, the Court should consider the factors set forth by the Supreme Court in *Graham v. Connor*: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of officers or others, and (3) whether she is actively resisting arrest or attempting to evade arrest by flight ("*Graham* factors"). 490 U.S. 386, 396 (1989).

The Court finds that the *Graham* factors in this case weigh in favor of only minimal force. First, at most, Plaintiff was suspected of only a misdemeanor. *See Perea*

---

[3] In *Maresca*, the Tenth Circuit considered an excessive force claim after determining that the plaintiffs were arrested without probable cause. The court explained that "[b]ecause we treat claims for unlawful arrest and excessive force as separate causes of action, [plaintiffs'] success on their unlawful arrest claim against [defendant] does not carry over to their excessive force claim." 804 F.3d at 1313. Rather, for purposes of analyzing the excessive force claim, the Tenth Circuit "assume[d], for sake of argument, that [defendant] reasonably believed that the truck was stolen and thus had probable cause to arrest [plaintiffs]." *Id.*

*v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016) (stating that suspicion of a misdemeanor supports, at most, the use of minimal force). Second, although Defendants argue that Plaintiff "began aggressively approaching" the officers and that her "unhinged tirade jeopardized a dying man's medical treatment" (Doc. # 71 at 15), the Court finds that the evidence simply does not show that Plaintiff posed a threat to anyone at the scene. Finally, it does not appear that Plaintiff resisted arrest or attempted to flee. Plaintiff did walk away from the scene, but she was not under arrest at that point. By the time the officers grabbed Plaintiff to apply handcuffs, she at most passively resisted by buckling her knees but otherwise did not move or resist the application of handcuffs. Viewing the evidence in the light most favorable to Plaintiff, the Court finds that the *Graham* factors, on balance, weigh in favor of Plaintiff.

The Court's analysis cannot end there, however, because the Court must also consider whether Plaintiff has established that her injury was more than de minimis. *See Fisher v. City of Las Cruces*, 584 F.3d 888, 896 (10th Cir. 2009). The Tenth Circuit has acknowledged that "in nearly every situation where an arrest is authorized, or police reasonably believe public safety requires physical restraint, handcuffing is appropriate." *Id.* Given that handcuffing is typically an appropriate use of force, "the *Graham* factors are less helpful in evaluating the degree of force applied in cases . . . where the handcuffing is permissible yet the *manner* of handcuffing may render the application of force excessive." *Id.* at 896–97. In these cases, the Tenth Circuit has held that a plaintiff must show "some actual injury that is not de minimis, be it physical or emotional" in order to prevail on her excessive force claim. *Cortez*, 478 F.3d at 1129.

Defendants argue that they are entitled to summary judgment because there is no evidence of any actual injury, let alone a non-de minimis injury, that Plaintiff incurred because of Defendants handcuffing her. (Doc. # 71 at 13–16.) In her Response, Plaintiff does not address de minimis injury and instead focuses only on the *Graham* factors to argue that summary judgment is not appropriate. (Doc. # 79 at 11–15.) Elsewhere, Plaintiff disputes that "Defendants caused [her] no injury"; but she cites only to her deposition testimony in which she testified that she felt pain in her back when she was handcuffed, but she did not tell anyone and she did not experience any other injuries. (Doc. # 79 at 6; Doc. # 79-3 at 6.) The Court finds that this is insufficient to establish a genuine dispute of material fact as to whether Plaintiff suffered an actual injury that is not de minimis. *See Donahue v. Wilhongi*, 948 F.3d 1177, 1197 (10th Cir. 2020) (finding no actual non-de minimis injury where the plaintiff alleged he sustained bruising, but there was no evidence of permanent injury); *Koch v. City of Del City*, 660 F.3d 1228, 1247–48 (10th Cir. 2011) (holding that officers were entitled to qualified immunity on an excessive force claim where a plaintiff failed to show non-de minimis injury from handcuffing that resulted in "superficial abrasions" on her arms); *Cortez*, 478 F.3d at 1129 (concluding that evidence that handcuffs "left red marks that were visible for days afterward" was "insufficient, as a matter of law" to establish non-de minimis injury for an excessive force claim).

Plaintiff therefore has not established a genuine dispute of material fact as to actual injury, nor does she point the Court to any evidence in the record showing that she sustained a non-de minimis injury as a result of Defendants handcuffing her. Absent

such evidence, Plaintiff cannot prevail on her claim for excessive force based on handcuffing. *See Donahue*, 948 F.3d at 1197. Defendants are entitled to qualified immunity and summary judgment in their favor on Plaintiff's excessive force claim.

## D.   MALICIOUS PROSECUTION

Finally, Defendants move for summary judgment on Plaintiff's malicious prosecution claim on the grounds that (1) Plaintiff's claim is not cognizable under Tenth Circuit precedent because she was detained "prior to the institution of legal process" and (2) Plaintiff cannot satisfy several elements of a malicious prosecution claim. (Doc. # 71 at 16–20.)

### 1.   Applicable Law

Malicious prosecution claims alleging violations of the Fourth Amendment are cognizable under § 1983. *Taylor v. Meacham*, 82 F.3d 1556, 1560–61 (10th Cir. 1996). In considering a malicious prosecution claim, the Court uses the common law elements of malicious prosecution as the "starting point" of its analysis. *Novitsky*, 491 F.3d at 1257–58. Those elements are: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was no probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages. *Id.*

However, because § 1983 creates a cause of cause of action to remedy certain violations of federal rights, but is not itself a source of substantive rights, "the ultimate question is whether plaintiff has proven the deprivation of a constitutional right." *Id.*

(quoting *Taylor*, 82 F.3d at 1561). Following the Supreme Court's decision in *Albright v. Oliver*, 510 U.S. 266, 272 (1994), in the § 1983 malicious prosecution context, "that constitutional right is the Fourth Amendment's right to be free from unreasonable seizures." *Taylor*, 82 F.3d at 1561. Thus, to prevail on a malicious prosecution claim, a plaintiff must prove that the defendant's actions deprived her of her liberty interests under the Fourth Amendment. *See, e.g.*, *Thompson v. Clark*, 142 S. Ct. 1332, 1337 (2022) (citing *Pitt v. Dist. of Columbia*, 491 F.3d 494, 510 (D.C. 2007), for the proposition that "nearly every other Circuit has held that malicious prosecution is actionable under the Fourth Amendment to the extent that the defendant's actions cause the plaintiff to be 'seized' without probable cause").

2.    Deprivation of a Constitutional Right

Defendants first argue that, as a threshold matter, Plaintiff cannot sustain a Fourth Amendment claim for malicious prosecution because her seizure occurred *prior* to the institution of legal process. (Doc. # 71 at 16.) Defendants cite to *Myers v. Koopman*, 738 F.3d 1190, 1194 (10th Cir. 2013), in which the Tenth Circuit explained that, typically, "[u]nreasonable seizures imposed *with legal process* precipitate Fourth Amendment malicious prosecution claims," whereas seizures "imposed *without legal process* precipitate Fourth Amendment false imprisonment claims." *Id.* (emphasis added) *see Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008) (explaining that "the issuance of an arrest warrant represents a classic example of the institution of legal process"). However, the Tenth Circuit has expressly rejected Defendants' argument that this general distinction limits Plaintiff to only a false imprisonment claim. *See Wilkins*,

528 F.3d at 798 (stating that a plaintiff arrested without a warrant can have a cognizable malicious prosecution claim arising from "the probable cause determination made during the constitutionally-required probable cause hearing"); *Sanchez v. Hartley*, 810 F.3d 750, 757 (10th Cir. 2016) ("Our holding in *Wilkins* forecloses defendants' argument that [plaintiff] is confined to a false-imprisonment claim because he was arrested without a warrant."). Because it is well established that a malicious prosecution claim may proceed in cases where a plaintiff is arrested without a warrant, the Court rejects Defendants' argument that Plaintiff's malicious prosecution claim is "improper" or "impossible." (Doc. # 71 at 16–17); *see Sanchez*, 810 F.3d at 757; *Wilkins*, 528 F.3d at 798.

Defendants' argument, however, implicates a different issue: whether Plaintiff can establish a deprivation of her Fourth Amendment rights after Defendants purportedly "caused" her prosecution by initiating legal process. As Defendants note, Plaintiff's "seizure"—i.e., being arrested, handcuffed, and placed in a police car— occurred *before* Defendants issued a summons and complaint to Plaintiff for failure to desist or disperse. The question therefore remains whether Plaintiff can prove a deprivation of her rights stemming from the summons (the institution of legal process).

The undisputed evidence in this case demonstrates that Plaintiff was issued a summons and complaint for failure to desist and disperse on December 12, 2018, after she was arrested. (Doc. # 71-15 at 1.) Plaintiff was issued and served with the summons after she was unhandcuffed and released. (Doc. # 71-11, Lambert BWC at 59:05–1:02:20; Doc. # 71-13, Inazu BWC at 17:45–17:53, 26:35–27:10.) The summons

directed Plaintiff to appear at Colorado Springs Municipal Court on a specific date and stated: "Failure to pay fine or appear in court may result in a bench warrant for your arrest and/or your driver's license being revoked." (Doc. # 71-15 at 1.) Plaintiff appeared and was acquitted at a bench trial on June 19, 2019. (Doc. # 71-16.) There is no evidence that Plaintiff was arrested or subject to any other type of seizure after she was issued the summons.

Based on these facts, the Court finds that Plaintiff had not demonstrated any deprivation of her liberty interests arising from Defendants' issuance of the summons for failure to desist and disperse. *See Novitsky*, 491 F.3d at 1257; *see also Kee v. City of New York*, 12 F.4th 150, 162 (2d Cir. 2021) (stating that a plaintiff "must demonstrate a 'sufficient post-arraignment liberty restraint'" to prevail on a § 1983 malicious prosecution claim (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 2015 (2d Cir. 2000))). Plaintiff has not identified any restraint on her liberty or "seizure" that took place *after* the summons was issued, and the only possible restraint the Court can identify is Plaintiff's required appearance at a court date. However, the Tenth Circuit has held that "the issuance of a citation, even under threat of jail if not accepted, does not rise to the level of a Fourth Amendment seizure." *Martinez v. Carr*, 479 F.3d 1292, 1299 (10th Cir. 2007). The Tenth Circuit is not alone in this determination—the majority of circuits have also held that the issuance of a summons requiring a court appearance does not rise to the level of a "seizure" for purposes of the Fourth Amendment. *See, e.g.*, *Burg v. Gosselin*, 591 F.3d 95, 98 (2d. Cir 2010) ("We hold that the issuance of a pre-arraignment, non-felony summons requiring a later court appearance, without further

restrictions, does not constitute a Fourth Amendment seizure."); *Bielanski v. Cty. of Kane*, 550 F.3d 632, 642 (7th Cir. 2008) ("No court has held that a summons alone constitutes a seizure, and we conclude that a summons alone does not equal a seizure for Fourth Amendment purposes. To hold otherwise would transform every traffic ticket and jury summons into a potential Section 1983 claim.").[4] Based on this precedent, the Court has little trouble concluding that the summons issued in this case, without any further deprivation of liberty interests, cannot suffice to establish a Fourth Amendment violation for purposes of a malicious prosecution claim.

Even assuming without deciding that Plaintiff can establish the elements of the common law tort of malicious prosecution by demonstrating that (1) Defendants caused her prosecution by issuing her a summons; (2) the action terminated in her favor because she was acquitted, (3) there was no probable cause to issue her a summons for failure to desist and disperse; (4) Defendants acted with malice; and (5) she suffered damages, Plaintiff cannot demonstrate that Defendants' actions violated her Fourth Amendment rights by resulting in an unreasonable seizure. Because Plaintiff cannot establish a constitutional violation in connection with her malicious prosecution claim,

---

[4] Although a summons alone is not a "seizure" within the Fourth Amendment, several courts have held that a summons combined with other restrictions or circumstances may constitute a significant enough deprivation of liberty interest rising to the level of a "seizure." *See Gallo v. City of Philadelphia*, 161 F.3d 217, 22 (3d Cir. 1998) (determining that pretrial restrictions including a travel prohibition, a requirement to contact Pretrial Services on a weekly basis, and a requirement that the plaintiff attend all court hearings including his trial and arraignment presented a "close question" but ultimately "amounted to a seizure"); *Murphy v. Lynn*, 118 F.3d 939 (2d Cir. 1997) (concluding that a summons "to appear in court in connection with those charges whenever his attendance was required," resulting in eight required court appearances, and a travel prohibition was sufficient to constitute a Fourth Amendment seizure).

Defendants are entitled to qualified immunity. The Court therefore grants summary judgment in Defendants' favor on Plaintiff's malicious prosecution claim.

### IV. <u>CONCLUSION</u>

For the foregoing reasons, it is ORDERED as follows:

- Defendants' Motion for Summary Judgment (Doc. # 71) is GRANTED IN PART and DENIED IN PART.

- It is GRANTED with respect to Plaintiff's Fourth Amendment Claim for Excessive Force and her Fourth Amendment Claim for Malicious Prosecution. Defendants are entitled to qualified immunity on these claims.

- It is DENIED as to Plaintiff's Fourth Amendment Claim for Unlawful Seizure/False Arrest and Unreasonable Search.

DATED: June 20, 2023

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
Senior United States District Judge